In re the TERMINATION OF the
PARENT–CHILD RELATION-
SHIP OF M.B. and S.B.

Tiffany Black, Mother, Appellant–
Respondent,

v.

Howard County Department of Child
Services, Appellee–Petitioner.

No. 34A02–0805–JV–437.

Court of Appeals of Indiana.

Oct. 31, 2008.

Brent R. Dechert, Kokomo, IN, Attorney for Appellant.

Julie A. Stalker, Kokomo, IN, Attorney for Appellee.

## OPINION

BROWN, Judge.

Tiffany Black ("Mother") appeals the Howard Circuit Court's order denying her motion to set aside its order for the voluntary termination of Mother's parental rights to her children, M.B. and S.B. Concluding (1) that the addendum to Mother's voluntary consent to termination form is void and unenforceable as a matter of law and (2) that the trial court properly denied Mother's Trial Rule 60(B) motion to set aside judgment, we affirm.

Mother is the biological mother of M.B., born on March 29, 2000, and S.B., born on June 23, 2002. M.B. and S.B.'s natural father is deceased. The evidence most favorable to the trial court's judgment reveals that on March 19, 2007, the Howard County Department of Child Services ("HCDCS") filed a petition for the involuntary termination of Mother's parental rights to her two children. An initial hearing on the termination petition was held on April 9, 2007, during which Mother denied the allegations of the petition. A fact-finding hearing on the termination petition was set for June 4, 2007. Immediately prior to the fact-finding hearing, Mother, after consulting with her attorney, executed a voluntary relinquishment of parental rights form for each child. Attached to each consent form was an addendum, drafted by her attorney, entitled "Post Adoption Privileges[.]" Appellant's App. at 38. The addendums were identical and provided as follows: "The parent, Tiffany [B.], consents to voluntarily relinquish her parental rights and consent (sic) to adoption is subject to the Court granting post-adoption privileges and the adoptive parents consenting to post-adoption contact by and between themselves and [S.B.] and [M.B.] pursuant to I.C. 31–19–16–2." *Id.* The consent forms and attached addendums were submitted to the trial court at the commencement of the involuntary termination hearing.

The trial court reviewed the proffered consent forms and properly advised Mother of her constitutional and other legal

rights, as well as the consequences of her voluntary consent pursuant to Indiana Code Sections 31–35–1–8 and –12. In so doing, the trial court stated, among other things:

> I need to advise you that … your consent to the termination of your parental/child relationship is permanent and it cannot be set aside unless it could be later shown it was obtained by either fraud or duress or unless the court would find that you were not competent at the time you gave your consent. You understand that when the court terminates a parent/child relationship, all rights, powers, privileges, immunities, duties and obligations, and that includes any rights to custody, control, visitation or support that pertain to that relationship, are permanently terminated. That your consent to the child's adoption would not be required.

Tr. at 9–10. The trial court then asked Mother's attorney, Brent Dechert ("Dechert"), to describe for the record his consultation with Mother regarding her decision to voluntarily consent to termination and to explain how the "reservation of post-adoption visitation" would work. *Id.* at 11. The following exchange took place:

> [Dechert]: Judge, I did meet with [Mother] for, oh, approximately 30 minutes at least before the hearing here today and prior to showing her any voluntary termination of parental rights paperwork, we did go over … what her options were here today and certainly made sure that she wasn't being forced or threatened to enter into this agreement…. I have to give her my legal opinion as to what I believe the outcome would be based upon the history of this case and my involvement for the last several years in this matter and I certainly gave her my opinion but in no uncertain terms

told her that she has the right to proceed today at the [involuntary termination] hearing.

\* \* \*

> We also discussed that if she voluntarily relinquishes her parental rights that she could be entitled to post-adoption contact if the [HCDCS] allowed that and, which the [HCDCS] did[,] and I reviewed that with her and told her that that (sic) post-adoption contact would only continue so long as it is in the children's best interest and if at any point in time a court, either this court or another court, determine[s] it is no longer in the children's best interest, she would not be entitled to further visitation and she indicated she understood that and continued to believe that this agreement and the voluntary relinquish (sic) of parental rights was in her best interest and the children's best interest.

> [Judge]: [Mother], you understand that by giving your consent to the termination of parent/child rights, you're giving up the rights of which I had advised you earlier and that it is subject to this reservation of post-adoption privileges which you understand, as Mr. Dechert's explained, to be subject to a court determining that it's in the child's best interest for such visitation or conduct to occur?

> [Mother]: Yes.

*Id.* at 11–13. The trial court then questioned Mother as to whether the HCDCS or anyone else had offered anything of value, made any threats to her or anyone else, or forced her to do anything against her will to get her to agree to voluntarily relinquish her parental rights. Mother responded, "No." *Id.* at 13. The trial court again confirmed, "This is your free and

voluntary decision?" *Id.* Mother replied, "Yes." *Id.*

At the conclusion of the hearing, the trial court accepted Mother's consent to voluntarily terminate her parental rights to M.B. and S.B. In so doing, the trial court stated:

> Well, the court would make a finding today that [Mother] has acknowledged, having understood her rights in this matter, that she wishes to voluntarily relinquish her parent/child rights with regard to her children, [M.B.] and [S.B.], and that that is both freely and voluntarily made after consultation with her counsel, Mr. Dechert....
>
> * * *
>
> Therefore, the court would show that it would accept the Voluntary Relinquishment of Parental Rights as executed by [Mother], subject to the post-adoption privileges, as filed here today.

*Id.* at 14. Later the same day, the trial court issued an order for the voluntary termination of the parent-child relationship between Mother and her children thereby permanently terminating all of Mother's "rights, powers, privileges, immunities, duties and obligations, including the right to consent to adoption," as they related to M.B. and S.B. Appellant's App. at 40. Mother was permitted, however, to continue visitation with both children, who remained wards of HCDCS, twice a month as per the addendums. Meanwhile, on or about June 15, 2007, M.B. and S.B. were placed in a new, pre-adoptive foster home with Todd and Lora W. Todd and Lora, however, were unaware of Mother's visitation privileges.

A three-month CHINS periodic review hearing was held on September 10, 2007. Mother was not notified of the hearing. During the review hearing, HCDCS case manager Laura Lee ("Lee") recommended that visitation between Mother and the children be terminated. Lee based her recommendation on reports she had received from the children's therapist, adoption caseworker, and foster parents that the children were emotional and upset following their visits with Mother and would exhibit other negative behaviors including bedwetting. At the conclusion of the review hearing, the trial court determined visitation between Mother and the children was no longer in the children's best interests and ordered Mother's visitation privileges terminated. When Mother appeared for her regularly scheduled visitation with the children two days later, she was advised of the trial court's order to terminate her visitation privileges and was informed that her visit with the children that day would be her final "good-bye" visit. Tr. at 86. Mother has not visited with the children since September 12, 2007.

Mother filed a motion to set aside the order for voluntary termination of the parent-child relationship on February 5, 2008, pursuant to Indiana Trial Rule 60(B). In her motion, Mother argued the trial court's June 2007 voluntary termination order should be set aside for "fraud and/or misrepresentation of the [HCDCS] as visitation has been terminated and the potential adoptive parents are apparently unwilling to allow post[ ]adoption privileges." Appellant's App. at 46. Mother further claimed (1) that her relinquishment of parental rights was not freely and voluntarily given because she was "induced to enter the agreement by the false promises of the [HCDCS][,]" and (2) that her consent "imposed a contractual obligation upon the Court and the [HCDCS] to allow visitation with her children" which contract should now be deemed void and terminated because the Court and the HCDCS "failed to abide by the terms of the contract[.]" *Id.*

A hearing on Mother's motion to set aside was held on February 28, 2008. The trial court entered its order denying Mother's motion on April 14, 2008. Mother now appeals the denial of her motion to set aside, but frames the issue as a direct appeal of the June 2007 voluntary termination order, claiming her consent to the termination of her parental rights was obtained through fraud and that she was denied due process of law when she was not notified of the post-termination review hearing after which the trial court terminated her visitation privileges. The proper issue for review, however, is not the validity of the trial court's termination order, but is instead whether the trial court properly denied Mother's motion to set aside under Indiana Trial Rule 60. *See In re K.E. v. Marion County Office of Family & Children*, 812 N.E.2d 177, 179 (Ind.Ct. App.2004) (concluding that in mother's appeal of trial court's denial of motion to set aside judgment terminating mother's parental rights, proper issue to address was whether trial court properly denied motion under rule governing relief from judgment, not substantive arguments concerning underlying judgment), *trans. denied.*

Before reviewing Mother's assertion that the trial court improperly denied her motion to set aside its termination order, we pause to address, sua sponte, what appears to be an issue of first impression, that is, whether Indiana's termination statutes permit a parent to sign a voluntary consent form for the termination of his or her parental rights while reserving the right to post-adoption visitation privileges. Because of the important due process rights involved in termination proceedings, contract law principles, although helpful, are not necessarily determinative in cases involving consent forms for the voluntary termination of parental rights. *See generally, Lee v. State*, 816 N.E.2d 35,

38 (Ind.2004) (stating contract law principles helpful but not determinative in cases involving plea agreements due to due process rights involved—i.e. a court would not enforce a plea agreement calling for a sentence of death for jaywalking) (citations and quotations omitted). Nevertheless, because voluntary consent forms are contracts, the principles of contract law can provide guidance under the facts of this case. *Id.*

The term *void ab initio* literally means "void from the beginning" and denotes an "act or action that never had any legal existence at all because of some infirmity in the action or process." *Lighty v. State*, 727 N.E.2d 1094, 1096 (Ind.Ct.App. 2000) (internal quotations omitted). In general, the law declares that a contract made in contravention of a statute is void and unenforceable. *Lee*, 816 N.E.2d at 38. However, it is also true that if a contract contains an illegal provision that can be eliminated without frustrating the basic purpose of the contract, the court will enforce the remainder of the contract. *Id.*

Indiana Code Section 31–35–6–4 clearly and unambiguously describes the rights, privileges, and obligations retained by a parent after the termination of his or her parental rights as follows: "If the juvenile court ... terminates the parent child relationship ... all *rights*, powers, privileges, immunities, duties, and obligations, *including any rights to custody, control, parenting time*, or support, pertaining to the relationship, are *permanently terminated.*" Ind.Code § 31–35–6–4(a)(1) (1998) (emphasis added). Mother's addendum, however, contravenes this statute. In what appears to be an attempt to avoid the permanent cessation of her parental right to visit with M.B. and S.B. due to imminent involuntary termination proceedings, Mother executed a contract wherein she voluntarily consented to the

termination of her parental rights, subject to an addendum that provided for post-adoption visitation. The specific language of the addendum provides that Mother's voluntary consent was "subject to the Court granting post-adoption privileges and the adoptive parents consenting to post-adoption contact ... pursuant to I.C. 31–19–16–2." Appellant's App. at 106. As such, we conclude Mother's addendum impermissibly attempts to sidestep the clear and unambiguous provision of Indiana Code Section 31–35–6–4(a)(1) requiring the complete and permanent termination of all parental rights, including the privilege of visitation, once termination of parental rights is ordered by the trial court. We further conclude that Mother's attempt to use Indiana Code Section 31–19–16–2, a statute providing for post-adoption visitation privileges, to avoid the permanent termination of her right to visit with the children is also contrary to Indiana law.

Indiana Code Section 31–19–16–1 provides that a court entering an adoption decree may grant post-adoption contact privileges under Indiana Code Section 31–19–16–2 to a birth parent who has previously voluntarily relinquished his or her parental rights *at the time an adoption decree is entered[,]* and not, as Mother would have us do, prior to, or as a condition precedent to, a parent's voluntary consent to termination. Ind.Code § 31–19–16–1 (1998) (emphasis added.) Moreover, Indiana Code Section 31–19–16–2 requires several pre-conditions to be met before post-adoption visitation may be granted, including, among other things (1) that consent from each adoptive parent be given and (2) that a written, post-adoption contract between the birthparents and adoptive parents be filed with the court. Such conditions can never be satisfied at the time of termination because adoption cannot occur until after the termination of all parental rights of the natural parent.

Consequently, Mother's addendum not only violates Indiana Code Section 31–35–6–4(a)(1), but also constitutes an improper use of Indiana Code Section 31–19–16–2 in an attempt to "bootstrap" otherwise impermissible conditions into a termination order.

We have previously recognized, however, the principle that a contract will not automatically be held void merely because it violates a statute. *Jaehnen v. Booker,* 806 N.E.2d 31, 36 (Ind.Ct.App.2004), *trans. denied.* In such cases, we have held that a court may consider other factors such as the subject matter of the contract, the strength of the public policy underlying the statute, and the likelihood that the court's decision in voiding the contract will actually further that public policy. *Id.* We therefore consider whether public policy favors our conclusion that Mother's addendum is void because it violates Indiana's termination statutes.

"American public policy holds that children are likely best raised by their parents[,]" and that termination of parental rights is a tool of "last resort" to be used only after parents have had "numerous opportunities to rectify their situations" but have failed to do so "over a prolonged period." *Baker v. Marion County Office of Family & Children,* 810 N.E.2d 1035, 1041 (Ind.2004). Notwithstanding this policy, our Supreme Court has recognized, "It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents" and "there is little that can be as detrimental to a child's sound development as uncertainty." *Id.* at 1040 (internal quotations omitted) (quoting *Lehman v. Lycoming County Children's Servs. Agency,* 458 U.S. 502, 511, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982)).

■ Although couched in terms of a natural parent's ability to arbitrarily withdraw his or her voluntary consent to termination and adoption, we find the policy rationale of *Matter of Snyder*, 418 N.E.2d 1171 (Ind.Ct.App.1981), to be applicable to the present case. In *Snyder*, another panel of this Court stated:

> If a natural parent were allowed to arbitrarily withdraw his or her voluntary relinquishment of parental rights, then adoption of the child would be discouraged. Few prospective parents would want to start the lengthy process of adoption when there is a possibility that the natural parent would withdraw his or her relinquishment of parental rights, thus ending the adoption proceedings. A ruling allowing the arbitrary withdrawal of a voluntary relinquishment of parental rights would subject every adoptive parent and child to the possibility of a most cruel and emotional turmoil, and because of this fact it would make adoptive parents the ready prey of possible unscrupulous parents. Therefore a parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiating factors.

*Id.* at 1180 (internal citations and quotations omitted). Similarly, we believe that allowing parents to avoid the consequences of the termination of their parental rights by attaching an addendum to a voluntary consent form which provides for visitation, or any other parental right, in contradiction of Indiana Code Section 31–35–6–4(a)(1), would impermissibly tie the hands of both the trial court and the Department of Child Services while at the same time discourage adoption. Few prospective parents would endeavor to embark on the life-changing journey of adoption knowing they could find themselves the ready prey of possible unscrupulous parents who were contractually entitled to demand post-adoption visitation and other parental privileges following a termination of the parent-child relationship. Finding the addendum in this case void as a matter of law will further the strong public policy underlying Indiana's termination statutes in protecting our children's emotional well-being and in avoiding prolonged uncertainty in the lives of children whose parents have failed to rectify their situations. We therefore conclude that the addendum in the present case is *void ab initio* and thus unenforceable as a matter of law.

■ Having concluded the addendum is void, we must next consider whether such a decision renders the entire voluntary consent contract void. A single instrument executed by the same parties may contain separate and independent contracts. *Heritage Development of Indiana, Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 890 (Ind.Ct.App.2002). The failure of a distinct part of a contract does not void valid, severable provisions. *Id.* Thus, if a contract contains an illegal provision that can be eliminated without frustrating the basic purpose of the contract, the court will enforce the remainder of the contract. *Lee*, 816 N.E.2d at 39; *see also Jaehnen*, 806 N.E.2d at 34 (stating statute invalidating cognovit notes did not render entire agreement void).

■ Here, the basic purpose of the contract was to obtain Mother's voluntary consent to the termination of her parental rights to M.B. and S.B. Although we acknowledge that the addendum for post-adoption visitation was presumably an important component of the contract, at least from Mother's perspective, we nonetheless conclude that severing the addendum does not frustrate the basic purpose of the re-

mainder of the agreement. This is true because the issue of potential post-adoption visitation was collateral to the paramount issue of whether Mother voluntarily consented to the termination of her parental rights. Although not previously expressed in terms of contract law principles, our view is consistent with the approach courts have taken on other occasions. *See e.g. Lee*, 816 N.E.2d at 39 (concluding that illegal sentencing provision in plea agreement did not eviscerate entire plea agreement); *see also Harbour v. Arelco, Inc.*, 678 N.E.2d 381, 385 (Ind.1997) (concluding that illegal attorneys fee provision in rental agreement did not render entire contract invalid).

Mother makes no claim that her consent to termination was given unknowingly or unintentionally. A thorough review of the record also confirms Mother freely and voluntarily consented to the relinquishment of her parental rights, even though future visitation with her children was not guaranteed. At the commencement of the involuntary termination hearing, Mother informed the trial court that she wished to voluntarily terminate her parental rights. The trial court subsequently advised Mother of her constitutional and other legal rights, as well as the consequences of her consent to termination, pursuant to Indiana's voluntary termination statutes. *See* Ind.Code §§ 31–35–1–8 and –12. For example, the trial court confirmed that Mother understood her consent would result in the termination of all her parental rights, including her right to visitation with the children. The trial court also advised Mother that her reservation of post-adoption visitation privileges made in

the addendum were "subject to a court determining it's in the child's best interest for such visitation or conduct to occur." Tr. at 13. Similarly, Dechert informed the Court he had advised Mother that if she voluntarily relinquished her parental rights she "could" be entitled to post-adoption contact but that if the trial court, or any other court, determined that visitation was no longer in the children's best interests, she would "not be entitled to further visitation[.]" *Id.* at 12. For all these reasons, we conclude that the illegal portion of the contract to voluntarily terminate Mother's parental rights to M.B. and S.B., namely, the addendum, can be eliminated without frustrating the basic purpose of the contract. The remaining consent form is therefore enforceable by the trial court.[1]

We now turn to Mother's allegation on appeal that the trial court erred in denying her motion to set aside its order terminating her parental rights because her consent was obtained by fraud on the part of HCDCS. As stated previously, Mother's allegations on appeal are framed as a direct appeal from the trial court's termination order. However, due to the procedural posture of this case, the proper issue we must address is whether the trial court properly denied Mother's Trial Rule 60(B) motion to set aside the trial court's order for voluntary termination of Mother's parental rights.

The decision whether to grant or deny a Trial Rule 60(B) motion for relief from judgment is within the sound, equitable discretion of the trial court. *Stonger v. Sorrell*, 776 N.E.2d 353, 358 (Ind.2002). Consequently, we will not re-

---

1. Having determined Mother's addendum reserving post-adoption visitation privileges is void, but that the remaining consent to termination is valid and enforceable, we need not address Mother's additional contention that she was denied due process of law when HCDCS failed to notify her of a CHINS review hearing held after the termination of her parental rights. Such notice was not required once Mother's parental rights were terminated. *See* Ind.Code § 31–35–6–4(a).

verse the denial of a motion for relief from judgment in the absence of an abuse of discretion. *Id.* An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Carter v. Knox County Office of Family & Children,* 761 N.E.2d 431, 437 (Ind.Ct.App.2001).

Where, as is the case here, the trial court enters special findings and conclusions pursuant to Indiana Trial Rule 52(A), our standard of review is two tiered. First, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Stonger,* 776 N.E.2d at 358. The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *Id.* In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* Rather, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.* Moreover, because the denial of a motion to set aside judgment is presumptively valid, *see Bonaventura v. Leach,* 670 N.E.2d 123, 125 (Ind.Ct.App.1996), *trans. denied,* the burden is on the movant (here, Mother) to show sufficient grounds for relief under Indiana Trial Rule 60(B). *In re Paternity of Baby Doe,* 734 N.E.2d 281, 284 (Ind.Ct.App.2000).

Trial Rule 60(B) sets forth eight reasons for setting aside a final judgment. Mother failed to specifically designate in her motion to set aside which of Trial Rule 60(B)'s enumerated reasons for relief her motion was based upon. Nevertheless, a fair reading of her motion reveals Mother's claim is based on Trial Rule 60(B)(3), which provides that a party may seek relief from a judgment for "fraud ... misrepresentation, or other misconduct of an adverse party[.]" T.R. 60(B)(3). In order to make a successful claim under Trial

Rule 60(B)(3), the motion to set aside must be filed not more than one year after the judgment or order was entered and the movant must "allege a meritorious claim or defense." The record reveals Mother timely filed her motion to set aside on February 5, 2008, less than one year following the entry of the trial court's order for voluntary termination of Mother's parental rights on June 4, 2007.

The Indiana Supreme Court has explained that Trial Rule 60(B)(3) also requires a movant claiming "fraud, misrepresentation or misconduct" to show (1) that the alleged fraud "prevented the movant from fully and fairly presenting the movant's case at trial[,]" and (2) that the movant has a "meritorious claim or defense." *Outback Steakhouse of Florida, Inc. v. Markley,* 856 N.E.2d 65, 73 (Ind.2006). This meritorious claim or defense requirement merely requires a prima facie showing, that is, "a showing that will prevail until contradicted and overcome by other evidence." *Id.* Thus, in order for Mother to obtain relief under Trial Rule 60(B)(3), she must show: (1) that her voluntary consent to termination of her parental rights was obtained through fraud, negligent misrepresentation, or misconduct on the part of HCDCS; (2) that said fraud, misrepresentation, or misconduct prevented Mother from fully and fairly presenting her case at the hearing; and (3) that Mother made a prima facie showing of a meritorious defense to HCDCS's petition for the involuntary termination of her parental rights.

In denying Mother's Motion to Set Aside, the trial court made the following pertinent special findings and conclusions:

5. On June 4, 2007, this Court conducted a hearing on [HCDCS's] petition, at which [Mother] voluntarily terminated her parental rights. [Mother] executed a Voluntary Relinquishment of Parental

Rights on State Form 12587 for each child, each form being notarized by [Mother's] court[-]appointed counsel, Brent R. Dechert, who represented [Mother] at the June 4, 2007 meeting. Attached to each form was an addendum entitled "Post Adoption Privileges" . . . . (hereinafter the "Addendum"). At the hearing held on February 28, 2008, [Dechert] admitted that he was the sole author of the Addendum.

6. Prior to the June 4, 2007 hearing, the Respondent met with . . . [Dechert] and discussed voluntarily terminating her parental rights subject to the post[-]adoption privileges addendum. At the hearing on the record, Mr. Dechert described and confirmed his advisements to [Mother] with regard to the addendum, as follows: "We also discussed that if she voluntarily relinquishes her parental rights that she could be entitled to post-adoption contact if the [HCDCS] allowed that and, which the department did and I reviewed that with her and told her that that post-adoption contact would only continue so long as it is in the children's best interest and if at any time a court, either this court or another court determines it is no longer in the children's best interest, she would not be entitled to further visitation and she indicated she understood that and continued to believe that this agreement and the voluntary relinquish [sic] of parental rights was in her best interest and the children's best interest."

7. At the hearing, Mr. Dechert further advised the parties and the [C]ourt ". . . it's both my understanding and [Mother's] understanding that at this point in time the [HCDCS] believes it is still in the children's best interest to continue with visitation and that they have not made any sort of determination at this point in time that visitation is not in their best interest, so based on her con-duct up until today, they do believe it is still in the children's best interest to visit with their mother, is that correct?" To Mr. Dechert's inquiry, the [HCDCS] case manager Scott Simmonds replied, "That's correct."

8. At the June 4, 2007 hearing, the [C]ourt advised [Mother] of her rights, the nature of the permanency of her termination[,] the [HCDCS's] burden of proof before the [C]ourt would terminate her rights without her consent[,] and confirmed with [Mother] that her voluntary consent to the termination was her free and voluntary decision. The [C]ourt further advised [Mother] that the post-adoption privileges were subject to a court determining that it's in the child's best interest for visitation to occur, to which [Mother] confirmed she understood.

9. At the conclusion of the June 4, 2007 termination hearing, this Court entered an Order for Voluntary Termination of the Parent–Child Relationship for each child wherein the parent-child relationship between each child and [Mother] be terminated and all rights, powers, privileges, immunities, duties and obligations, including the right to consent to adoption, pertaining to that relationship were permanently terminated.

10. Following the June 4, 2007 hearing, [Mother] continued to have visits with both children, said visits occurring approximately twice a month for a few hours each visit.

11. On or about June 15, 2007, the children were placed in a pre-adoptive foster home with Todd and Lora [W.]. Prior to having the children placed with them, the [foster parents] were not aware that [Mother] was continuing to visit with the children, or that her termination of parental rights involved a post-adoption privileges addendum.

12. The [foster parents] desire to adopt both children. In the event of their adoption of the ... children, the [foster parents] do not agree to [Mother's] continued visitation and contact with the children.

\* \* \*

14. On September 10, 2007, this Court conducted a three[-]month review hearing in the underlying CHINS cause of action for ... [the children]. [Mother] was not present at said hearing as [Mother's] rights to said children were terminated pursuant to the Court's orders entered on June 4, 2007. At this review hearing, the [HCDCS] by its case manager Laura Lee recommended that the visitation between the children and [Mother] terminate, as the children were exhibiting behaviors indicating emotional upset and confusion after visits. At the conclusion of the CHINS review hearing, the Court ordered that visitations between [the children] with their mother ... cease.

\* \* \*

17. On February 5, 2008, [Mother] by her counsel [Dechert] filed a Motion to Set Aside the Order for Voluntary Termination of the Parent–Child Relationship. In her motion, [Mother] alleges that her voluntary consent to the termination of her parental rights was obtained by fraud, as the [HCDCS] had represented at the termination hearing that it would agree to continued visits between [Mother] and the children, but then reneged.

18. A hearing on [Mother's] motion was held on February 28, 2008....

19. Any finding of fact contained in the conclusions is hereby incorporated.

## CONCLUSIONS OF LAW

\* \* \*

4. [Mother] bears the burden to prove fraud. The elements of actual fraud are: (1) [material] representation of past or existing facts by the party to be charged; (2) which was false; (3) which was made with knowledge or reckless ignorance of the falseness; (4) was relied upon by the complaining party; and (5) proximately caused the complaining party injury....

5. This Court finds that [Mother] has failed in her burden of proving fraud.

a. The Addendum exclusively addresses post[-]adoption visitation rights pursuant to Ind.Code 31–19–16–2. [Mother] has provided no competent evidence of a probative value that [HCDCS] made false statements regarding [Mother's] rights to have visitation continue after the termination hearing. While [Mother] testified at the February 28th hearing that it was her expectation that visits would continue after she voluntarily relinquished her parental rights, there was no testimony or any competent evidence of probative value presented to demonstrate that [HCDCS] made a material representation that was false, which was made with knowledge or reckless ignorance of the falseness, which [Mother] relied on in making her decision to voluntarily relinquish her parental rights.

b. Upon questioning by [Mother's] counsel, [Mother] admitted that there was no guarantee that her rights of visitation would continue.

c. Further, upon questioning by counsel for [HCDCS], [Mother] admitted and confirmed that her counsel, at the termination hearing, made a statement on the record that "[Mother] *could be* entitled" to post-adoption

contact; that "post-adoption contact would only continue *so long as* it is in the children's best interest" and a court *could determine* that visits were not in her best interest and her visitation would end.... [Mother's] counsel chose and utilized phrases such as "could be" and "so long as." These phrases demonstrate that [Mother's] understanding was that visits may have been terminated at some point after the termination hearing. Further, upon questioning by [HCDCS] Counsel, [Mother] admitted that this was her understanding; she did not object to anything her counsel stated concerning her understanding of her relinquishing her parental rights at the termination hearing; and that she had the opportunity to consult with her counsel prior to her agreeing to voluntarily relinquish her parental rights. [Mother's] counsel informed the Court at the termination hearing that he consulted with [Mother] for at least half an hour prior to [Mother] executing the voluntary relinquishment forms and advised [Mother] that she could proceed with the termination hearing.

d. A review of the transcript ... reveals that the only statement made by [HCDCS] staff concerning visitation was that [HCDCS] agreed that "at this point" visitations were in the best interest of the children and that [based upon] [Mother's] conduct "until today" visits were in the best interest of the children. These are not misrepresentations of past or existing acts that were false. Further, [Mother's] own counsel chose and utilized the phrases "until today" and "at this point." This demonstrates that it was both [Mother] and [Mother's] counsel's understanding that visits may not have occurred in the future.

e. [Mother] has failed to prove that there was any reliance. Upon questioning by [HCDCS] counsel, [Mother] admitted her decision to terminate was her own free and voluntary decision and that she was not coerced into executing the voluntary relinquishment forms. [Mother's] own counsel went on the record that he advised his client that she "could" be entitled to post[-]adoption visits. Further, at the ... hearing, [Mother] answered in the affirmative when asked by the Court if she understood that her right of visitation was subject to a court determining that it was in the best interest of the children.... This demonstrates that [Mother] was aware and understood at the time of the termination hearing that visitation may have been stopped after the termination hearing.

f. [Mother] has not proven that there was any injury. [Mother's] testimony at both the termination hearing and the February 28th hearing indicate[s] that it was her understanding that visits could occur in the future, but were not guaranteed; a court would have to determine that it is in the children's best interest for visits to occur; and that this [C]ourt or any court could determine that visits were not in the best interest of the children and visits would have to stop. [Mother] knowingly and voluntarily assumed the risk that visits could stop at any time after the termination hearing and that visits were not guaranteed under the Addendum. [Mother] cannot demonstrate that she suffered any injuries because she voluntarily relinquished her parental rights knowing that her visitation rights could be terminated at any point in the future.

6. [Mother] argues ... that the adoptive parents are apparently unwilling to allow post[-]adoption privileges and this constitutes fraud. [Mother] has failed to demonstrate how there was any misrepresentation. [Mother] has not provided any evidence that [HCDCS] made any representation that would constitute fraud [or that] were made to induce [Mother's] consent. The language of the Addendum, which was drafted by [Mother's] counsel, emphasizes the fact that a court would have to determine that it is in the best interest of the children for visitation or contact to occur after the adoption. A plain reading of the Addendum indicates that ... even before adoptive parents could consent to post[-]adoption visitation[,] a court would need to determine that it is in the best interest of the children for the visitation to occur. [Mother] admitted at the February 28th hearing that she acknowledged this was a requirement for her to have any post[-]adoption visitation when she responded affirmatively at the termination hearing that she understood ... "post[ ]adoption privileges ... to be subject to a court determining that it's in the best interest for such visitation or conduct to occur."

7. Based upon the foregoing, the [C]ourt finds and concludes that [Mother] has failed to meet her burden to prove that her voluntary consent to the termination of her parental rights should be set aside due to fraud, or any other ground.

Appellant's App. at 84–92. A thorough review of the record reveals that the evidence presented during the termination hearing supports the trial court's findings and conclusions set forth above, and those findings and conclusions support its ultimate decision to deny Mother's motion to set aside.

 First, there is absolutely no evidence in the record indicating HCDCS committed fraud, or engaged in any misconduct or misrepresentation in an attempt to induce Mother to voluntarily relinquish her parental rights to M.B. and S.B. The elements of actual fraud are: (1) a material representation of past or existing facts by the party to be charged; (2) which was false; (3) which was made with knowledge or reckless ignorance of the falseness; (4) was relied upon by the complaining party; and (5) proximately caused the complaining party injury. *Youngblood v. Jefferson County Div. of Family & Children*, 838 N.E.2d 1164, 1169–70 (Ind.Ct. App.2005), *trans. denied.* The record reveals it was Mother who initially presented the signed voluntary termination consent forms, which were drafted solely by her own attorney, to the trial court at the commencement of the involuntary termination proceedings. Additionally, Mother does not direct our attention to, nor were we able to find, any evidence of promises made by HCDCS guaranteeing post-adoption visitation privileges. HCDCS caseworker Simmonds simply acknowledged that, *at the time of the termination hearing,* HCDCS agreed that visitation between Mother and the children was in the children's best interest. That Mother was in fact allowed to visit with the children on a regular basis for approximately three months following the termination of her parental rights is further proof of the sincerity of Simmonds' testimony. Moreover, visitation was not terminated until the children started exhibiting negative behaviors, including bedwetting, immediately following their visits with Mother.

Second, Mother has failed to show that the alleged fraud by HCDCS prevented

her from fully and fairly presenting her case at trial. Mother does not contend she would have revoked her consent and taken her chances at the involuntary termination proceeding had the trial court declined to accept her addendum to the voluntary consent form. Moreover, Mother readily acknowledged on multiple occasions throughout the termination hearing that she understood her statutory rights, pursuant to Indiana Code Section 31–35–1–12, that she freely and voluntarily wished to relinquish her parental rights, and that her ability to participate in any post-termination or post-adoption visitation with M.B. and S.B., as per her addendums to the voluntary termination consent forms, was not guaranteed but was contingent upon a prior finding by the trial court, or any other court, that visitation was in the children's best interests.

Third, we are unaware of any evidence offered by Mother of a meritorious claim or defense, either at the February 2008 hearing[2] or in her brief to this Court, demonstrating that if a hearing on the termination of her parental rights was tried on the merits, a different result would have been reached, i.e. Mother's parental rights would not have been terminated. Rather, the sole evidence regarding the merits of the underlying termination proceeding is found in the Court Appointed Special Advocate's ("CASA") report, which was submitted to the trial court prior to the termination hearing. The CASA's report referenced Mother's history of illegal drug use, instability with regard to employment and housing, and periods of incarceration throughout the

CHINS proceedings. The CASA thereafter recommended termination of Mother's parental rights so that the children could achieve permanency through adoption. Based on the foregoing, we conclude that Mother has failed to carry her burden of showing sufficient grounds for relief under Trial Rule 60(B)(3). The trial court therefore did not abuse its discretion in denying Mother's motion to set aside.

*Conclusion*

■ A partial termination of parental rights does not exist under Indiana law. *See* Ind.Code § 31–35–6–4. Either the parent-child relationship survives, or it does not. Given the plain and unambiguous language of Indiana Code Section 31–35–6–4(a)(1), coupled with Indiana's strong public policy to protect the emotional well-being of children whose parents have been either unable or unwilling to provide for their basic needs over a prolonged period of time, we conclude that Mother's addendums to the voluntary consent forms are *void ab initio* and thus unenforceable as a matter of law.

Removal of the illegal addendums under the particular facts of this case, however, does not frustrate the basic purpose of the voluntary consent contracts, which were freely and voluntarily executed by Mother. Moreover, given the procedural posture of this appeal, Mother was required to establish, among other things, that HCDCS committed fraud, misrepresentation, or misconduct in order to obtain relief under Trial Rule 60(B)(3). Simply put, we find no such evidence in the record. Accordingly, we conclude that the trial court did

---

2. Although Mother's Notice of Appeal requested the Howard Circuit Court reporter to transcribe, certify, and file "[a]ll proceedings in this matter[,]" the record on appeal did not contain the transcript of the February 2008 hearing on Mother's motion to set aside thereby frustrating our review of this issue. Appel-

lant's App. at 94. Counsel is reminded that, pursuant to Indiana Appellate Rule 11D, "[I]f the court reporter fails to file the Transcript with the trial court clerk within the time allowed, *the appellant shall seek an order from the Court on Appeal compelling the court reporter to do so.*" (Emphasis added.)

not abuse its discretion in denying Mother's motion to set aside its order for voluntary termination of Mother's parental rights to M.B. and S.B.

Notwithstanding our ultimate conclusion under the particular facts of this case, we nonetheless have serious concerns regarding the actions of the trial court, attorneys, and HCDCS in approving a post-termination visitation plan like the one involved herein. Trial courts are cautioned to refrain from approving post-termination agreements such as these in the future as they are contrary to Indiana law and are likely, under a different set of circumstances, to provide false hope to parents facing termination of their parental rights.

Affirmed.

BAKER, C.J. and MATHIAS, J., concur.